# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) JENNIFER SCOTT CALLAWAY, )<br>As parent and next friend of D.C., )<br>a minor child, )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>(1) INDEPENDENT SCHOOL DISTRICT )<br>NO. 1 OF OKMULGEE COUNTY a/k/a )<br>OKMULGEE PUBLIC SCHOOLS, )<br>a Political Subdivision of the State of )<br>Oklahoma; )<br>(2) STEPHANIE LEE; and )<br>(3) DALAWNA BRENT; )<br> )<br>Defendants. ) | Case No. 21-CV-051-SPS<br><br>ATTORNEY LIEN CLAIMED<br>JURY TRIAL DEMANDED |

## COMPLAINT

**COMES NOW** the Plaintiff, Jennifer Scott Callaway, as Parent and Next friend of D.C., a minor child, by and through her attorneys of record, and for her cause of action against the Defendants, Independent School District No. 1 of Okmulgee County a/k/a Okmulgee Public Schools ("OPS"), Stephanie Lee and Dalawna Brent states as follows:

## PARTIES

1. Plaintiff Jennifer Scott Callaway is a resident of Okmulgee County, Oklahoma, and the mother of minor child D.C., also a resident of Okmulgee County, Oklahoma.

2. D.C. is a child with special needs who receives special education and related services under an Individualized Education Plan ("IEP"), pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA").

3. Defendant Independent School District No. 1 of Okmulgee County a/k/a Okmulgee Public Schools ("OPS") is a political subdivision, organized and existing under

the laws of the State of Oklahoma, with its facilities and schools in Okmulgee County, Oklahoma.

4. OPS is a recipient of federal funds from the United States Department of Education pursuant to the IDEA and is required to provide a free and appropriate public education ("FAPE") in the least restrictive environment to all children with disabilities residing within its educational boundaries. OPS is also a "public entity" within the meaning of the ADA/ADAAA. *See* 42 U.S.C. § 12131.

5. OPS is responsible for all facets of school operations and programs within the City of Okmulgee school district, including the staffing and training of key positions, such as school administrators and special education administrators.

6. Upon information and belief, Defendant Stephanie Lee was and is a resident of Okmulgee County, Oklahoma at all times relevant hereto. During all times herein, Defendant Lee, the Principal of Dunbar Intermediate School ("Dunbar"), operated by Defendant OPS, was an agent and/or employee of Defendant OPS, acting within the scope, course and authority of her employment with OPS. As the principal of Dunbar Intermediate School Defendant Lee was responsible for the education program provided to D.C. under an IEP.

7. Upon information and belief that will be confirmed through discovery, Defendant Dalawna Brent was and is a resident of Okmulgee County, Oklahoma at all times relevant hereto. Defendant Brent is sued in her individual capacity as Special Education Director for OPS and was at all times relevant hereto an agent and/or employee of Defendant OPS, acting within the scope, course and authority of her employment with OPS. As the Special Education Director for OPS, Defendant Brent was responsible for the education program provided to D.C. under an IEP.

## JURISDICTION AND VENUE

8. Paragraphs 1-7 are incorporated herein by reference.

9. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343, premised upon the federal Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(3)(A) wherein it provides that "The district courts of the United States shall have jurisdiction of actions brought under this section without regard to the amount in controversy"; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("§ 504"); and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* ("ADA")

10. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

11. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy arising under the United State Constitution and federal law.[1]

12. This is an action for damages based on a disability in an educational setting pursuant to Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §12101 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and due

---

[1] On November 9, 2020, Defendant OPS was timely placed on notice of Plaintiff's tort claims in conformance with the Oklahoma Governmental Tort Claims Act, 51 Okla. Stat. § 156. Defendant OPS took no formal action upon the Tort Claim Notice and the same was deemed denied ninety (90) days thereafter and, pursuant to Okla. Stat. tit. 51 § 157, this action is timely filed.

process violations pursuant to 42 U.S.C. § 1983.

13. The IDEA requires parents who bring claims alleging a violation of free access to public education ("FAPE") work through a number of administrative procedures before filing suit against a school: 20 U.S.C. § 1415(*l* ).

14. The United States Supreme Court has held that a "complaint seeking redress for those other harms, independent of any FAPE denial, is not subject to § 1415(*l* )'s exhaustion rule." *Fry v. Napoleon Community Schools,* 137 S.Ct. 743, 754 (2017).

15. "A disabled child who asserts a constitutional claim having some relationship to education but no nexus to the IDEA is not required to pursue administrative remedies under the IDEA before filing suit under § 1983." *Franklin v. Frid,* 7 F. Supp. 2d 920, 925 (W.D. Mich. 1998).

16. Furthermore, IDEA exhaustion would be futile in this case because the "condition creating the damage has ceased." *Plasencia v. California*, 29 F. Supp. 2d 1145, 1152 (C.D. Cal. 1998).

17. Based on the foregoing and 28 U.S.C. § 1391(b)(2), venue is proper because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## **FACTUAL ALLEGATIONS**

18. Paragraphs 1-17 are incorporated herein by reference.

**D.C.'S DISABILITY**

19. D.C. is a minor who at all relevant times was a student enrolled at OPS.

20. D.C. has been diagnosed with Autism Spectrum Disorder and is eligible to receive benefits available through OPS's special education program.

21. As a result of his autism diagnosis, D.C. has a number of substantial educational limitations, including, but not limited to, difficulty verbally communicating.

22. D.C. was initially enrolled in OPS schools in 2016 as a Kindergartener at Okmulgee Primary School. At the time of his initial enrollment at OPS, D.C. was evaluated by the district and placed on a 100% IEP.

23. D.C.'s initial 2016 IEP required that D.C. be accompanied by an adult aide in all school activities, including using the bathroom.

24. OPS employee Rochelle Pierson has been D.C.'s aide since D.C.'s enrollment at Okmulgee Primary School in 2016.

25. D.C. attended Okmulgee Primary School from Kindergarten until his graduation as a fourth grade student in the spring of 2020.

26. Beginning in the fall of 2020, D.C. enrolled at Dunbar Intermediate School, which is a school for 5-8 grade OPS students.

27. Pursuant to the IDEA, in return for federal education funding states must make available a free appropriate public education (FAPE) to all eligible children. *Endrew F. v. Douglas Cnty Sch. Dist.* 137 S. Ct. 988, 993 (2017).

28. The IDEA requires states to identify children with disabilities and once those children have been identified they must be placed on an Individualized Education Plan ("IEP"). 20 U.S.C.A. §1412(a)(4) (2015), 20 U.S.C.A. §1414(d) (2015). The United States Supreme Court has stated an IEP is "the centerpiece of the [IDEA's] education delivery system for children with disabilities. *Fry v. Napoleon Cmty. Sch.* 137 S. Ct. 743, 748-749 (2017).

29. An IEP consists of a written statement of the present educational level of such

child, of annual goals and short-term instructional objectives, and of "specific educational services to be provided to such child." § 1401(a)(20).

30.     A team of people work cooperatively to formulate the IEP. This "IEP Team" comprises the student's parents or guardian; a school district representative; the student's regular and special education teachers; a person able to interpret the student's results and evaluations; and, when appropriate, the student. 20 U.S.C. § 1414(d)(1)(B).

**D.C.'s 2020- 2021 IEP**

31.     D.C.'s 2019-2020 IEP, applicable for D.C.'s fourth grade school year, was in effect from September 12, 2019, until September 11, 2020.

32.     With D.C.'s 2019-2020 IEP set to expire and D.C. transitioning to a new school, D.C.'s IEP team met on September 10, 2020 to review and finalize his 2020-2021 IEP. The IEP team consisted of

    a.  Plaintiff,
    b.  Special education teacher, Sheila Nelson;
    c.  D.C.'s General education teacher;
    d.  Administrative representative Dalawna Brent;
    e.  Occupational therapist, Stacie Packs;
    f.  Physical Therapist, Tina Nail;
    g.  Speech Language Pathologist, Brittany Howard.

33.     At the September 10, 2020 IEP meeting, the IEP team discussed D.C.'s progress from the prior school year and his needs going forward before finalizing D.C.'s 2020-2021 IEP which is set to be in effect from September 10, 2020 to September 10, 2021.

34.     The 2020-2021 IEP describes D.C.'s current struggles consisting of "severe receptive and expressive language disorder" which manifests in D.C. speaking no more than 2 to 3 words at a time.

35.     Included in the 2020-2021 IEP, just as it was in the previous year's IEP, was

the requirement that D.C. "be attended by an adult aide to all locations in and around the school, as in during lunch, recess, and specials."

36. D.C.'s aide in September of 2020, just as it had been throughout D.C.'s time at OPS, was Rochelle Pierson.

37. In addition to the requirement that D.C. be accompanied by an aide around the school, the IEP required that D.C. "<u>be attended by an adult aide in all toileting activities</u>."

38. The requirement of adult assistance in "all toileting activities" was a condition of D.C.'s IEP going back to his very first IEP in 2016.

39. There are numerous other mentions of D.C.'s toileting requirements in the 2020-2021 IEP, including the statement that D.C. "requires adult attendance and some assistance with toileting…he will ask to be taken to the restroom."

**SEPTEMBER 27, 2020 INCIDENT**

40. During the 2020-2021 school year D.C. was a fifth grade student in Sheila Nelson's special education class at Dunbar Intermediate School.

41. Ms. Nelson's special education classroom was located in the 7th and 8th grade hallway at Dunbar and was the class for all special needs students at Dunbar.

42. In September of 2020, there were approximately eight ("8") other special education students in the special education class with D.C. The students were supervised by Ms. Nelson with the help of individual special education aides.

43. On September 21, 2020, Special Education Teacher Sheila Nelson was on an extended absence from school due to an injury, leaving no teacher for the special education students.

44. Rather than provide another special education teacher, OPS elected to have

the special education aides, including Rochelle Pierson, cover for Ms. Nelson and supervise the special education students.

46. Due to Ms. Nelson's absence from school, there were just two adult aides in the special education classroom to supervise the eight special education students.

46. Because of the lack of supervision of the special education students, D.C. was allowed to leave the special education classroom to use the bathroom in the 7th and 8th grade hallway, without an aide or adult supervision.

47. While D.C. was in the restroom D.C. was confronted by a much older student, who took full advantage of the absence of an adult escort and photographed and recorded D.C.'s genitals while he was using the bathroom.

48. The older student then proceeded to share and/or distribute the photographs to other Dunbar students.

49. The photograph of D.C. using the restroom was viewed by a number of Dunbar students before a Dunbar student alerted a school employee of the existence of the photos.

**OPS's RESPONSE TO THE SEPTEMBER 21, 2020 INCIDENT**

50. On September 30, 2019, Plaintiff received a horrifying phone call from Defendant Lee, informing Plaintiff that D.C. had been photographed in the bathroom without his knowledge or consent and that the photos had been shared to other Dunbar students.

51. Plaintiff immediately went to Dunbar to discuss the incident with the school administrators and take D.C. home.

52. Plaintiff was told by Defendant Lee that she could not provide any substantive information regarding the bathroom incident because the matter was being handled by the

police.

53. Plaintiff was told by Dunbar employees that the photos were deleted but Plaintiff has not been provided proof that the photographs of D.C. are not still in existence.

54. Unable to receive any information or resolution of the issues from Dunbar/OPS, Plaintiff contacted the Okmulgee Police Department. Plaintiff was informed by the Okmulgee Police that because the Dunbar student who took the photograph of D.C. was a Native American, there was nothing that the Okmulgee Police could do as the matter would have to be handled by the Tribe/FBI.

55. Plaintiff subsequently contacted the Tribal Police who informed Plaintiff that the Tribe had no knowledge of the incident, as no one from Dunbar or OPS had contacted the tribal police to report the incident.

56. Defendants offered Plaintiff and D.C. limited or no assistance to help them cope with being a victim of sexual violence. To this day, Plaintiff is unaware if the photographs of D.C. are still in existence or if law enforcement officials have taken any action against the student who photographed D.C.

57. At all material times, OPS was receiving federal funding, as contemplated by Title IX, 20 U.S.C. § 1681, *et seq*.

58. OPS implemented and executed policies and customs in regard to the events that resulted in the deprivation of D.C.'s constitutional, statutory, and common-law rights.

59. OPS is responsible for ensuring that all of its employees are properly trained and supervised to perform their jobs.

60. OPS is responsible for the acts and omissions of its employees, agents, part-time student workers and tenants.

61. At all times relevant to this Complaint, Defendants failed to protect D.C, and others, as it failed to discharge their duties to provide safety to special education students.

62. OPS has violated D.C.'s rights by discriminating against D.C. on the basis of his disability by not protecting him while at school from harm and injury as evidenced by not providing a safe environment.

63. At the time of the events, OPS had knowledge of supervisory actions taken by its teachers and administrators, which violated its own policies and its students constitutionally protected rights. OPS endorsed this policy by failing to discipline its teachers, administrators and staff who participated therein or reporting their actions to the appropriate authorities.

64. As a direct and proximate result of the harassing educational environment created by Defendants' deliberately indifferent supervision of D.C., as well as violations of other Fourteenth Amendment rights, D.C. has suffered and continues to suffer psychological damage, emotional distress, and his future relationships have been negatively affected. Additionally, D.C. and his parents have lost time from work/school and have incurred actual damages.

## CAUSES OF ACTIONS

### I. Negligence as to Defendant OPS

65. Paragraphs 1-64 are incorporated herein by reference.

66. Defendant OPS owed a duty to D.C., as well as all other special education students, to provide an educational setting that was safe, secure, and free from harassment, intimidation, abuse, unwanted touching and to provide educational services pursuant to his written IEP.

67. Defendant OPS, by and through its employee(s), staff or agents breached these duties by failing to properly protect D.C., failing to ensure that its agents were appropriately supervising students, and by allowing D.C., a special needs student, to go to the bathroom unsupervised with older students.

68. OPS further breached its duties to D.C. by violating of one or more Oklahoma Statutes, including, but not limited to the Oklahoma Bullying Prevention Act 7(0 O.S. § 24-100.4), by failing to provide a safe and respectful learning environment for D.C. and by its inaction once it was confirmed that D.C. had been victimized.

69. D.C. is in the class of persons intended to be protected by the Oklahoma statutes related to school bullying.

70. The statutes and ordinances the Defendants violated were intended to prevent the bullying and harassment suffered by D.C.

71. These breaches by the Defendants were the actual and proximate cause of D.C.'s injuries.

72. As a result of Defendant OPS's negligence, D.C. has suffered personal injury, mental pain and suffering, emotional distress and other actual damages in excess of seventy-five thousand dollars ($75,000.00).

## II. NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION AS TO DEFENDANT OPS

73. Paragraphs 1-72 are incorporated herein by reference.

74. Defendant OPS owed a duty to D.C. and all other students to hire qualified, competent employees to teach and supervise the special education students of that community. Defendant owed a duty to train and supervise any and all employees in how to supervise and protect special needs students.

75. Additionally, by failing to properly hire, train, supervise and retain its employees in the reasonable administration of special education, Defendant acted with reckless disregard for the health and well-being of D.C. and other special needs students, and breached the duty owed to D.C.

76. These breaches were the actual and proximate cause of D.C.'s injuries.

77. As a result of Defendant OPS's negligence, D.C. has suffered psychological damage, emotional distress, his future relationships have been negatively affected, and he has sustained actual damages in excess of seventy-five thousand dollars ($75,000.00).

## III. VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### AS TO ALL DEFENDANTS
### (42 U.S.C. § 1983)

78. Paragraphs 1-77 are incorporated herein by reference

### A. Underlying Violations of Constitutional Rights/Individual Immunity

79. Under the Equal Protection Clause of the Fourteenth Amendment, D.C. had the right as a public school student to personal security and bodily integrity and equal protection of laws.

80. Furthermore, Article 1, Section 5 of the Oklahoma Constitution confers a right upon D.C. to receive a free public education. Such a right is a property and/or liberty interest, within the meaning of the Fourteenth Amendment of the United States Constitution.

81. An individual school official violates the Equal Protection Clause and is subject to a claim under § 1983 where the official exhibits "deliberate indifference to known sexual harassment." *Murrell v. School District No. 1*, 186 F. 3d 1238, 1250 (10th Cir. 1999).

82. At all times relevant hereto, Defendants Lee and Brent acted under color of law in their capacity as administrators at OPS.

83. Defendants Lee and Brent knew, or should have known, that their response to sexual assault allegations must comply with federal law, particularly as outlined in Title IX's published and widely promulgated implementing regulations.

84. Defendants discriminated against D.M., in whole or in part, because of his status as a child with a disability, denied him equal protection under the law as required under the Fourteenth Amendment to the U.S. Constitution.

85. OPS employees, including Defendants Lee, and Brent, each violated D.C.'s right to equal access by failing to ensure that the special education classroom at Dunbar was adequately staffed and by failing to ensure that the explicit requirements of D.C.'s IEP were being followed.

86. Students without disabilities were not subjected to the abuses D.C. was subjected to, as described herein. This difference in treatment was due, in whole or in part, to D.C.'s status as a student with disabilities and is unconstitutional.

87. D.C. has suffered physical, psychological, and emotional injuries, humiliation, embarrassment, and loss of self-esteem as a direct and proximate result of Defendants Lee and Brent's deliberate indifference to his rights under the Fourteenth Amendment of the United States Constitution.

B. **Monnell/Municipal Liability (applicable to OPS)**

88. Paragraphs 1-87 are incorporated herein by reference.

89. OPS was endowed by the State of Oklahoma with powers or functions governmental in nature, such that OPS became an instrumentality of the State and subject to its constitutional limitations.

90. OPS was charged with implementing and assisting in developing policies with

respect to the appropriate care of its students, specifically policies to keep special needs students safe from other students.

91. In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) the U.S. Supreme Court recognized that a municipality may be held liable for damages under § 1983.

92. Applying *Monell*, the Tenth Circuit in *Murrell* explained that a school district may be liable for student on student sexual harassment under § 1983 when a school's "discriminatory actions are representative of an official policy or custom of the [school district], or are taken by an official with final policy making authority." 186 F.3d at 1249.

93. Upon information and belief that will be confirmed through discovery, OPS has and/or had unconstitutional customs or policies of allowing sexual assaults to occur to OPS special needs students. Such policies, practices and/or customs include, but are not limited to:

   a) failing to train special education teachers and aides, or to hire qualified individuals to work in special education classrooms;
   b) failing to respond to a need for training and supervision of its agents who work with students with disabilities;
   c) failing to ensure that all OPS employees were aware and followed special education students' IEPs;
   d) Fostering an atmosphere and a system of indifference to the needs of special needs students like D.C.

94. OPS had knowledge (either through actual or constructive knowledge), or it

was obvious, that its policies, practices and/or customs posed substantial risks to the health and safety of special needs students like D.C.

95. OPS tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein, knew that such conduct was unjustified and would result in violations of constitutional rights, and evinced deliberate indifference to the serious needs of special needs students.

96. OPS's policies and/or practices constituted disparate treatment of special needs students and had a disparate impact on special needs students.

97. Had OPS administrators, including Defendants Lee and Brent, made any effort to properly train and supervise other OPS employees, D.C. would not have suffered these egregious and conscience-shocking abuses, nor would D.C. have sustained the damages that he has sustained.

98. OPS's actions and lack of actions were the proximate cause of D.C.'s emotional distress and psychological damage as a result of OPS' deliberate indifference to D.C.'s right to equal protection under the Fourteenth Amendment.

99. D.C. has suffered physical, psychological, and emotional injuries, humiliation, embarrassment, and loss of self-esteem as a direct and proximate result of Defendant School District's deliberate indifference to his rights under the Fourteenth Amendment of the United States Constitution.

### IV. VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

100. Paragraphs 1-99 are incorporated herein by reference.

101. Pursuant to 42 U.S.C. § 12132, section 202 of Title II, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be

denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

102. At all relevant times herein, D.C. was/is a qualified individual with a disability within the meaning of the Americans with Disabilities Act ("ADA").

103. At all relevant times herein, Defendant OPS was/is a public entity as defined by Title II of the ADA.

104. Under the ADA the Defendant(s) are required to provide reasonable accommodations necessary to provide access to education to its disabled students. Failing to provide appropriate services and supports for D.C. to be able to safely attend school, constituted discrimination based on disability.

105. The Defendants failed to support and accommodate D.C.'s educational program to meet his needs as adequately as the needs of students without disabilities. The Defendant(s) failed to reasonably accommodate D.C. because he needed ASD services to enjoy meaningful access to the benefits of a public education, and the Defendant(s) were on notice that he needed those ASD specific services but did not provide those services. Finally, the services he needed were available as a reasonable accommodation.

106. The Defendants actions and omissions, as described herein, were based on D.C.'s disabilities.

107. The Defendants actions and omissions altered D.C.'s education and subjected him to a hostile educational environment, and denied services, programs and activities to D.C. that were full and equal to programs and activities provided to non-disabled persons.

108. Defendant OPS is vicariously liable for its employee's discriminatory conduct. When a plaintiff brings a direct suit under the ADA, a public entity is liable in

*respondeat superior* for the acts of its employees. *Duvall v. County of Kitsup*, 260 F.3d 1124 (9th Cir. 2001).

109.    Defendant's actions and omissions violated 42 USC §12132, Section 202 of Title II, and the regulations promulgated thereunder.  As a result of Defendants' failure to comply with its duties under Title II, D.C. has suffered damages including humiliation, embarrassment and emotional distress as alleged heretofore.

### V. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973

110.    Paragraphs 1-109 are incorporated herein by reference.

111.    Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 ("Section 504"), and the regulations promulgated there under, 34 C.F.R. Part 104, prohibit discrimination against persons with disabilities.

112.    Section 504 prohibits the exclusion from the participation in, or being denied the benefits of, or being subjected to discrimination under, any program or activity receiving federal financial assistance. Congressional authority to condition federal funding under this Act is derived from the enumerated powers contained in Article 1, Section 8 of the U.S. Constitution.

113.    At all relevant times herein, D.C. was/is disabled as defined by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et. seq.*

114.    Defendant OPS is a recipient of federal financial assistance.

115.    D.C. attended Dunbar/OPS through an IEP subject to Section 504.

116.    The acts and/or omissions of the Defendants were conducted within the scope of their official duties and employment and under color of law.

117.    The Defendants discriminated against D.C. by failing to adequately staff the

special education classroom and not provide D.C. the adult aide he is required, in violation of D.C.'s documented needs.

118. The Defendants had the means to accommodate D.C.'s disabilities and such accommodations would not have imposed an undue hardship to Defendants.

119. The Defendants acted and omitted with deliberate indifference, which caused D.C. to be vulnerable to and subjected to harassment.

120. The Defendants' actions and omissions were based solely on D.C.'s disabilities.

121. The Defendants' acts and omissions altered D.C.'s education, subjected him to a hostile educational environment, and denied services, programs and activities to D.C. that were full and equal to programs and activities provided to non-disabled persons.

122. The Defendants' acts and omissions violated D.C.'s rights under § 504 of the Rehabilitation Act of 1973, 29 USC § 794, and the regulations promulgated thereunder.

123. Defendant OPS is vicariously liable for the actions or inactions of its employees under the principal of *respondeat superior*. *Bonner v. Lewis*, 857 F.2d 559, 566 (9th Cir. 1988).

124. As a result of the Defendants' failure to comply with its duties under § 504 of the Rehabilitation Act of 1973, 29 USC § 794, and the regulations promulgated thereunder, D.C. has suffered damages including humiliation, embarrassment and emotional distress as alleged heretofore.

**WHEREFORE,** based on the foregoing, Plaintiff prays that this Court grant the relief sought including, but not limited to actual damages, including mental and physical pain and suffering, emotional injuries, humiliation, embarrassment, loss of self-esteem, punitive

damages, attorney fees, court costs, and any other relief to which the Plaintiff may be entitled all in excess of seventy-five thousand dollars ($75,000.00).

Respectfully submitted,

SMOLEN | LAW, PLLC


/s/ Donald E. Smolen, II
Donald E. Smolen, II, OBA#19944
Laura L. Hamilton, OBA#22619
Dustin Vanderhoof, OBA #21388
Jack Warren, OBA #33635
611 S. Detroit Ave.
Tulsa, OK 74120
P: (918) 777-4LAW (4529)
F: (918) 890-4529
don@smolen.law
laura@smolen.law
dustin@smolen.law
jack@smolen.law
*Attorneys for Plaintiff*